UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARVIN KAM CONSTRUCTION COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ENVIRONMENTAL CHEMICAL CORPORATION,<br><br>Defendant. | Case No. 16-cv-02643-JD<br><br>**ORDER RE PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 37, 43 |

This order addresses the cross-motions for summary judgment brought by plaintiff Arvin Kam Construction Company ("AKCC"), an Afghan entity, and defendant Environmental Chemical Corporation ("ECC"). Dkt. Nos. 37, 43. This case has stood out from the norm in several ways. The Commander of the United States Central Command, which is responsible for all military operations in Afghanistan and other parts of Central Asia and the Middle East, determined that plaintiff AKCC was a supporter of enemy insurgency against the United States. All of the pertinent events occurred in connection with the war in Afghanistan, and at locations there and elsewhere outside the United States. And in arguments presented to the Court, the parties have shown an unfortunate tendency to dwell on arcane defense contract regulations of unexplained relevance, and levy accusations against each other that are not helpful to resolving this litigation. This is not the first time the Court has noted these problems. *See, e.g.*, Dkt. No. 22.

The Court had hoped that providing guidance to the parties on possible summary judgment topics would help clarify the issues. Dkt. No. 33. But the resulting summary judgment motions are again difficult to follow, all the more so because the parties brought cross-motions on the same arguments, which has left the Court to sort out highly duplicative and occasionally inconsistent statements by each side. The Court is not, of course, tasked with rooting through the record to establish that there is no genuine dispute of material fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Even so, the Court has determined that the salient facts are largely undisputed and

that summary judgment is warranted for ECC on AKCC's contract-related claims, namely Claims Three, Four, Five and Six in the amended complaint. Dkt. No. 23. The fraud-based claims, Claims One and Two, are in limbo. Neither side briefed or argued summary judgment on these claims. Consequently, they are not addressed here, and this order is in effect entry of partial summary judgment.

## BACKGROUND

ECC is based in California and specializes in construction and environmental remediation projects. In 2010, the United States Army Corps of Engineers ("COE") awarded a multiple task order contract for the construction of several facilities in Afghanistan to a joint venture that included an ECC affiliate. One of the task orders commissioned the construction of a headquarters building for the Afghan National Police in Kunduz Province. ECC hired AKCC as a subcontractor for this project.

On the last day of December 2011, as the headquarters construction was underway, President Obama signed into law the National Defense Authorization Act for Fiscal Year 2012, PL 112-81, 125 Stat. 1298 ("NDAA"). The NDAA addressed a number of national security issues and programs, and included several provisions directed to counter-terrorism efforts and holding enemy combatants to account for aggression against the United States and its allies.

One of these provisions was Section 841 of the NDAA, which imposed a "Prohibition on Contracting with the Enemy in the United States Central Command Theater of Operations." It directed the Commander of the United States Central Command, then General James Mattis, to review the recipients of United States contract funds to identify "persons or entities who are actively supporting an insurgency or otherwise actively opposing United States or coalition forces in a contingency operation." *Id.* § 841(c)(1). Contracts providing funding "directly or indirectly" to such a person or entity would be voided in whole or in part, restricted, or terminated for default in accordance with an order from the Commander and other procedures laid out in the statute. *Id.* § 841(a). Any contract declared void is "unenforceable as contrary to public policy." *Id.* § 841(a)(2). Section 841 also required that all current and future government contracts include a clause (i) requiring recipients to ensure that no government funds directly or indirectly reach an

entity supporting the insurgency, and (ii) giving the government a contractual right to terminate as void any agreement found to provide such funds. *Id.* § 841(b). Later defense appropriation laws contained similar provisions and extended the ban on providing funds to the enemy until December 2021. *See* National Defense Authorization Act for Fiscal Year 2014, PL 113-66, 127 Stat. 672, Sec. 831; National Defense Authorization Act for Fiscal Year 2015, PL 113-291, 128 Stat. 3292, Sec. 841; National Defense Authorization Act for Fiscal Year 2019, PL 115-232, Sec. 872.

In July 2012, pursuant to Section 841(c), General Mattis determined that AKCC was "actively supporting an insurgency" and directed the "Head of Contracting Authority" to apply the sanctions in Section 841(a) to "any contracts, grants, or cooperative agreements that provide funding directly or indirectly" to AKCC. Dkt. No. 41, Ex. 1. General Mattis also ordered that the Head Contracting Authority "shall not award" any new "contract, grant, or agreement" to AKCC. *Id.*

In August 2012, a COE contracting officer instructed ECC to "terminate Arvin Kam Group" or face default proceedings. *Id.*, Ex. 2. The letter did not expressly cite Section 841 or General Mattis's findings but invoked termination on the basis of "force protection reasons" and a clause in the contract with COE that required compliance with the laws and regulations of the United States. *Id.* ECC terminated AKCC a few days later. At the time of the termination, the contract between ECC and COE had not yet been amended to add the terms called for by Section 841(b).

Although the termination had been effected under the NDAA, AKCC and ECC entered into settlement agreements in 2013 and 2014 (the "Agreements") in connection with AKCC's demands for compensation for the early termination. Why ECC did this is unclear, particularly since the parties do not dispute that it terminated the contract with AKCC purely on the basis of the national security and insurgency determination. ECC offers only a vague suggestion that it was pressured into making the Agreements by political forces. Dkt. No. 37 at 6-7.

In any event, the Agreements are the basis of AKCC's claims in this case. Despite the centrality of those documents to this litigation, neither party has provided them to the Court, and

3

they were not tendered with the summary judgment motions. The Court can only rely on the parties' characterizations of their contents, on which they fortuitously agree. According to the parties, the Agreements provide in pertinent part that ECC will pay AKCC $1.5 million directly, and submit to the United States government on AKCC's behalf reimbursement claims totaling more than $3 million *See, e.g.*, Dkt. No. 23 ¶¶ 13-18; Dkt. No. 37 at 6-7; Dkt. No. 44 at 14-15.

ECC also felt aggrieved by the termination directive, and initiated proceedings for compensation from the COE for its own claims. ECC took the position that the termination demand did not conform to the requirements of Section 841, in part because the contract had not been amended to integrate the Section 841(b) terms. *See, e.g.*, Dkt. No. 41, Ex. 3 at 10. The COE denied ECC's claims, and ECC appealed to the Armed Services Board of Contract Appeals ("ASBCA"). After the ASBCA denied cross-motions for summary judgment in a 2015 decision, the parties reached a confidential settlement. *Id.*, Ex. 7; Dkt. No. 38 ¶¶ 7-9. AKCC was not a party to the ASBCA proceedings.

The thrust of AKCC's claims is that ECC failed to live up to promises it made in the Agreements and other settlement communications, and that ECC settled for its own expenses without seeking any additional money for AKCC. *See generally* Dkt. No. 23. AKCC alleges claims sounding in contract (Claims Three, Four, Five, and Six), and in fraud (Claims One and Two).

**LEGAL STANDARDS**

"A party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may dispose of less than the entire case and just portions of a claim or defense. *Smith v. California Dep't of Highway Patrol*, 75 F. Supp. 3d 1173, 1179 (N.D. Cal. 2014).

Under Rule 56, a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. *Id.*

4

at 248-49. In determining whether a genuine dispute of material fact exists, the Court will view the evidence in the light most favorable to the nonmoving party and draw "all justifiable inferences" in that party's favor. *Id.* at 255. A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The moving party can initially establish the absence of a genuine issue of material fact, which it must do by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. It is then the nonmoving party's burden to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *Id.* at 324. "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**DISCUSSION**

To start the analysis, it's useful to specify what is not properly before the Court. First and foremost, the validity, propriety, and accuracy of General Mattis's determination that AKCC was a supporter of enemy insurgency are not subject to the Court's review. The insurgency determination was a national security decision made under the NDAA in a theater of war. "National-security policy is the prerogative of the Congress and President," and "[j]udicial inquiry into the national-security realm raises 'concerns for the separation of powers in trenching on matters committed to the other branches.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) (quoting *Christopher v. Harbury*, 536 U.S. 403, 417 (2002)). For this reason, federal courts "'traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs' unless 'Congress specifically has provided otherwise.'" *Id.* (quoting *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988)).

AKCC does not assert any statutory or constitutional grounds that might provide a good reason to depart from judicial deference here. It also says it accepts the fact of the insurgency determination, but nevertheless repeatedly attacks it as procedurally improper and based on faulty information. *See, e.g.*, Dkt. No. 43 at 6-7; Dkt. No. 47 at 7-8. In effect, it invites the Court to

second-guess the determination and substitute its judgement for that of the military. This the Court will not do. To be clear, AKCC cannot challenge the fact that the United States properly made the insurgency determination, properly instructed ECC to terminate the subcontract with AKCC, and has properly continued to treat AKCC as subject to federal contract restrictions to this day for national security reasons. *See* Dkt. No. 39-6 (stating AKCC's insurgency classification is "Indefinite").

The Court also declines ECC's suggestion that it should not hear this case at all as a matter of law or prudential considerations. In the effort to provide guidance to the parties, the Court posed an open-ended question about the right *vel non* of a foreign insurgency supporter to sue in federal court. Dkt. No. 33 at 2. In response, ECC proffered cases from the Civil War and World War II that it construes as categorically barring actions by enemy combatants in federal court. *See* Dkt. No. 37 at 8-11. Even accepting for now ECC's interpretation of these cases, which is subject to question, they involved a level of direct hostilities against the United States that is several steps away from AKCC's circumstances. ECC does not otherwise dispute that the case is properly before the Court on diversity jurisdiction, or that AKCC has met the standing requirements of Article III. Consequently, the Court may not simply decline to hear the case on "prudential" grounds. *See Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128-29 and nn.3, 4 (2014).

With these clarifications, the germane question is whether the Agreements are enforceable by AKCC in light if its insurgency designation. The answer is no.

To start, the parties agree that California law governs the contract questions. Dkt. No. 37 at 20; Dkt. No. 43 at 15. While the subcontract between ECC and AKCC was to be interpreted under California law, Dkt. No. 38 ¶ 5, no similar choice of law is apparent for the Agreements. Nonetheless, the parties' mutual selection of California law is appropriate. *See Bassidji v. Goe*, 413 F.3d 928, 933 (9th Cir. 2005); *Kashani v. Tsann Kuen China Enter. Co.*, 118 Cal. App. 4th 531 (2004).

"Under California law, 'the general rule [is] that the courts will deny relief to either party who has entered into an illegal contract or bargain which is against public policy.'" *Bassidji*, 413

6

F.3d at 938 (quoting *Tri-Q, Inc. v. Sta-Hi Corp.*, 63 Cal. 2d 199 (1965)); *see also Akopyan v. Wells Fargo Home Mortg., Inc.*, 215 Cal. App. 4th 120, 135 (2013) ("A contractual provision that contravenes public policy is illegal and either void or unenforceable."). This rule is based on the rationale that the public importance of discouraging such prohibited transactions outweighs equitable considerations of possible injustice between the parties. *See Asdourian v. Araj*, 38 Cal. 3d 276, 291 (1985).

Unlawful contracts are not only those that are contrary to "an express provision of law," but also those that go against "the policy of express law, though not expressly prohibited" or are "[o]therwise contrary to good morals." Cal. Civ. Code § 1667. In addition, "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." *Id.* § 1668.

There is no question that AKCC's subcontract with ECC was void as against public policy under the express provisions of Section 841(a) of the NDAA. AKCC does not seriously dispute this state of affairs, but argues that the Agreements were purely private arrangements between itself and ECC, and so are outside the purview of Section 841. Dkt. No. 43 at 11-13. AKCC also claims that the NDAA governs only direct contracts with the government, but not subcontracts. Dkt. No. 47 at 7.

These points are not well taken. It is the purpose of the contract, and not the identity of the parties, that determines whether it is void on public policy grounds. *See Kashani*, 118 Cal. App. 4th at 541. The Agreements called for ECC to pay AKCC over $1 million directly and to help it secure over $3 million from the United States government. Those terms violate Congress's plainly expressed policy in the NDAA to deny funds "directly or indirectly" to entities that actively support insurgency against the United States and its allies. AKCC does not adduce any facts, law, or persuasive argument to conclude otherwise.

That is enough to warrant dismissal of the contact claims as void as a matter of public policy under Section 841 of the NDAA and Section 1667 of the California Civil Code. A good argument can also be made that allowing AKCC's claims to proceed would shield it from the

consequences of its conduct in violation of Civil Code Section 1668.

As a final contention, AKCC says that the doctrine of judicial estoppel should bar ECC from asserting that AKCC is a supporter of the insurgency. This is analytically flawed for a variety of reasons. To start, it is an indisputable fact that General Mattis and the United States Central Command determined that AKCC was an insurgency supporter. AKCC's own complaint makes reference to it. Dkt. No. 23 ¶ 9; *see also* Dkt. No. 43 at 7. This fact exists in the record and may be relied upon by the Court independent of anything ECC might say.

In addition, AKCC has failed to establish the elements of judicial estoppel. This equitable doctrine is intended to prevent litigants from playing fast and loose with the judicial system by successfully obtaining an advantage in court on one theory, and then switching to an inconsistent theory to gain another advantage. *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001); *Morales v. Ocwen Loan Servicing, LLC*, No. 3:17-CV-00979-JD, 2018 WL 3093440, at *2 (N.D. Cal. June 22, 2018) (citing *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001)). "The Court's discretion to apply judicial estoppel is informed by whether (1) a party's later position is 'clearly inconsistent' with the earlier position; (2) a court has accepted or adopted the party's earlier position; and (3) a party, if not estopped, would obtain an 'unfair advantage' relative to the opposing party." *Morales*, 2018 WL 3093440 at *2 (quoting *New Hampshire*, 532 U.S. at 750-51); *see also Hamilton*, 270 F.3d at 783.

AKCC's main argument for estoppel is that ECC denied in the ASBCA appeal process that AKCC supported insurgency and then successfully settled the appeal on this basis. Dkt. No. 43 at 10; Dkt. No. 47 at 3-5. AKCC cites no meaningful evidence for either proposition. Its denial theory is based primarily on one footnote in a brief ECC filed with the ASBCA to the effect that it reserved the right to challenge several factual allegations made by COE, including whether AKCC was a supporter of the insurgency. *See* Dkt. No. 41, Ex. 5 at 10 n.3. The problem for AKCC is that this was nothing more than a reservation of a possible issue, and ECC expressly stated in the same footnote that AKCC's insurgency status was "irrelevant" to the ASBCA appeal. *Id.* AKCC stretches its estoppel theory even more thinly by saying that an ASBCA tribunal agreed with ECC that AKCC did not support insurgency. *See* Dkt. No. 43 at 10. But it did no such thing. It found

only that the record before it was not enough to conclusively show that AKCC had committed treason or violated the laws of Afghanistan. Dkt. No. 41, Ex. 7 at 25. AKCC is equally without evidence that the settlement reached in the ASBCA proceedings was in any way based on ECC's denial of AKCC's insurgency status.

## CONCLUSION

The record establishes, free of any genuine disputes of fact, that the Agreements are unenforceable as against public policy. Consequently, summary judgment against AKCC on the contract claims is warranted. This includes the promissory estoppel claim because the enforcement of ECC's alleged promise to obtain money from the United States for AKCC would be contrary to the plain language and policy of the NDAA, and because AKCC could not, as a matter of law, have justifiably relied on a promise to take such improper actions. *See Downey Venture v. LMI Ins. Co.*, 66 Cal. App. 4th 478, 510 (1998); *see also Kashani*, 118 Cal. App. 4th at 541.

That leaves the fraud claims, which the parties did not raise in these cross-motions. It is possible that these claims may be subject to dismissal for similar public policy reasons, but the parties will, of course, be given an opportunity to present argument on the issue. They are directed to work out a schedule for summary judgment on the fraud claims. They may raise any arguments they wish, and are expected to reach an agreement to avoid making duplicative arguments in cross-motions. The parties are advised that duplicative or overlapping briefing may be disregarded by the Court and stricken from the docket.

**IT IS SO ORDERED.**

Dated: April 15, 2019

JAMES DONATO
United States District Judge